**Dated: March 29, 2024**

**The following is ORDERED:**



PAUL R. THOMAS
UNITED STATES BANKRUPTCY JUDGE

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF OKLAHOMA

IN RE:
**WILLIAM JAMES HUYCK III**         **Case No. 22-80089-PRT**
**JULIE ANNE HUYCK,**               **Chapter 7**
             **Debtors.**

### <u>ORDER DENYING DEBTORS' MOTION TO REMOVE CHAPTER 7 TRUSTEE</u>

In simplest terms, to receive a chapter 7 discharge, individual debtors must satisfy their duty to disclose their finances fully and honestly and cooperate with the trustee who is appointed to administer their bankruptcy estate. Trustees have statutory duties to investigate the finances of debtors to identify potential assets and, where appropriate, convert those assets to cash for the purpose of paying valid creditor claims. To perform this duty, a trustee typically reviews the debtor's bankruptcy documents[1] and asks questions at the meeting of creditors to determine whether the information provided by debtors is sufficient and reliable. If the trustee is satisfied that the information in the bankruptcy documents is sufficient and reliable, he or she may then move on to administer the estate.

---

[1] Petition, schedules, statements, and creditors matrix.

But what happens when a trustee does not believe the information provided by debtors is sufficient and reliable? In the Court's experience, in such circumstances, trustees seek information from third parties to either confirm the financial story told by the debtors, or to develop one that more accurately represents the facts. The debtors in this case, William James Huyck and Julie Anne Huyck, expected the Trustee to believe the financial story they told through their bankruptcy petition and schedules, testimony at the meeting of creditors, and production of certain documents. Mr. Greenough, the panel trustee appointed in this case, after investigating, arrived at a point where he did not believe the financial story provided by the Huycks. If he had, this would be a no-asset case. Instead, the Trustee recovered assets that sold at auction for $99,000. And he was met with the Huycks' motion to remove him as trustee.[2]

Over the course of the two and a half day evidentiary hearing, the Court provided the Huycks, as pro se litigants, with an ample opportunity to present facts to support their motion to remove Mr. Greenough as Trustee.[3] The Court repeatedly reminded them that proof of their disagreement and dissatisfaction with the Trustee about his approach and administration of their case was simply not cause for removal. Even so, by the close of evidence, the Huycks failed to meet their burden to show that cause exists to remove Mr. Greenough as Trustee. Instead, the evidence established that Mr. Greenough acted in a professional and proper manner in administering this case. Therefore, based upon the evidence presented to the Court, the

---

[2] Request to Remove Mr. Greenough as Trustee filed by William James Huyck III and Julie Anne Huyck, Pro Se Huycks, ECF No. 55. This was followed by the Trustee's Response, ECF No. 79; and Response filed by the Huycks, ECF No. 81. The Huycks filed their Request to Remove Greenough on April 10, 2023. That same day, they also filed a Motion to Remove Terry Bigby as their attorney, ECF No. 54. In response, Mr. Bigby filed a Motion to Withdraw as Debtors' Counsel, ECF No. 58, which was granted on April 26, 2023, ECF No. 66.
[3] This Court held an evidentiary hearing on this matter over three days: July 12, 2023, August 2, 2023, and August 30, 2023. The parties then submitted written closing arguments.

arguments of the parties, and the applicable law, the Court finds that the Huycks'

Motion/Request to Remove Mr. Greenough as Trustee must be denied.

**Jurisdiction**

This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and § 1334(a). A motion for

removal of a trustee is a core proceeding which this Court may hear and determine as provided in

28 U.S.C. § 157(b)(2)(A).

This Order constitutes the Court's findings of fact and conclusions of law pursuant to

Fed. R. Bankr. P. 9014.

**Findings of Fact**

**A. Background**

Mr. and Mrs. Huyck filed their bankruptcy case on February 28, 2022.[4] At the time of the

filing, the Huycks were represented by attorney Terry Bigby and resided in a home on a rural

tract of land in Cookson, Oklahoma. Their initial filing consisted of 69 pages of documents.[5]

The Huycks were not inexperienced in the bankruptcy process and procedure. They each

had filed bankruptcy cases in Colorado prior to the current case.[6] They testified that they knew

and understood that, as debtors, they must disclose all property and interests that they owned and

all debts they owed in sufficient detail to enable the trustee assigned to properly administer their

bankruptcy estate.

Charles Greenough ("Trustee") has been practicing bankruptcy law since 1988. He has

served as the trustee in over 11,500 bankruptcy cases, having been appointed as a panel trustee in

---

[4] Chapter 7 Voluntary Petition, ECF No. 1.
[5] *Id*.
[6] Mr. Huyck filed two previous bankruptcy cases in Colorado: Case No. 97-22373, a chapter 13 case filed in 1997; and Case No. 03-33833, a chapter 7 case filed in 2003. Mrs. Huyck filed a chapter 7 case in Colorado, Case No. 05-24543 in 2005. Each case resulted in the entry of a discharge.

2004. Mr. Greenough was appointed to serve as the chapter 7 trustee in the Huycks' bankruptcy case.[7] He conducted the initial meeting of creditors on April 4, 2022.[8] The meeting of creditors was continued to April 26, 2022, and then again to May 3, 2022. On May 3, 2022, the Trustee concluded the meeting of creditors.[9] Besides the Huycks and the Trustee, Mr. Bigby and Karen Walsh, Assistant United States Trustee for Region 20, attended these meetings.

### B. 341 Meetings and the Red Flags

The Trustee testified that in his preparation for conducting the initial § 341 meeting of creditors in this case, he reviewed the Bankruptcy Petition, Schedules, and Statement of Financial Affairs ("Bankruptcy Documents") filed on behalf of the Huycks as well as other documents routinely provided via debtors' counsel prior to the § 341 meeting. Based on this review, the Trustee initially identified several problems or "red flags" that needed further investigation. The Huycks listed two valuable vehicles ("Vehicles") on Schedule A/B: a 2022 GMC Sierra Pickup ("2022 GMC") valued at $58,000, and a 2020 Jeep Wrangler ("2020 Jeep") valued at $48,000.[10] On Schedule D, the Huycks listed WLPOC, LLC ("WLPOC") as the secured creditor for both Vehicles. No address was included for WLPOC. The amount of the secured claim on the 2020 Jeep was listed as $48,000. The amount of the secured claim on the 2022 GMC was listed as $58,000. The "Date debt was incurred" was left blank for both Vehicles.[11] Neither the 2020 Jeep nor the 2022 GMC were claimed exempt on Schedule C.[12]

---

[7] Notice of Chapter 7 Bankruptcy Case, ECF No. 6.

[8] The initial meeting of creditors and each of the continuations were conducted by telephone.

[9] Resp't's Ex. AA. *See also* Trustee's Statement Adjourning 341(a) Meeting of Creditors on April 26, 2022, and continuing to May 3, 2022, ECF No. 14. It is unknown why the Trustee's Statement Adjourning Meeting of Creditors, ECF No. 27, indicates that the Meeting of Creditors was concluded on May 10, 2022.

[10] Schedule A/B, 2, ECF No. 1.

[11] Schedule D, 2, ECF No. 1.

[12] Schedule C, ECF No. 1.

WLPOC was not listed on the Creditor Matrix, therefore it did not receive notice of the bankruptcy filing via the official noticing agency of the Court.[13] The Trustee explained that it was very unusual for a secured creditor's address to be omitted from the matrix.

During the initial meeting of creditors, both Mr. and Mrs. Huyck testified under oath that they each carefully read through the Bankruptcy Petition, Schedules, and Statement of Financial Affairs that Mr. Bigby had prepared and filed for them. They further testified that they each signed the Bankruptcy Documents after reading them and that they did not know of any changes or corrections that needed to be made to the documents that were filed.[14] The Trustee asked them about the secured creditor of their Vehicles, WLPOC. Mr. Huyck testified that it was part of the Huyck Corporation out of New York.[15] The Trustee continued the meeting of creditors because he had additional information to gather and because he was running behind on his docket.

Between the shortened initial meeting of creditors and the continued meeting, the Trustee sent an email, dated April 5, 2022, to Mr. Bigby requesting, among other things, additional information and documents related to vehicle loans with WLPOC, an explanation of a company called "Huyck, Inc." or "Huyck Corporation" that Mr. Huyck referred to at the initial meeting of creditors, an explanation as to why an address was not included for WLPOC and why WLPOC was not listed on the creditor matrix.[16] Through their attorney, the Huycks provided documents and explanations prior to the initial meeting of creditors and in response to some of the Trustee's requests, including Certificates of Title for each vehicle[17] and Loan Agreements between the

---

[13] Verification to Creditor Matrix with Attachment, 6-11, ECF No. 1.
[14] Resp't's Ex. X-0002 – 0003. This testimony was later contradicted by the Huycks at the evidentiary hearing on their Motion to Remove the Trustee. *See infra* pp. 11-12.
[15] Resp't's Ex. X-005.
[16] Resp't's Ex. B.
[17] Resp't's Exs. G and H.

Huycks as borrowers and WLPOC, LLC (A division of the Huyck Corporation) as the Lender.[18] The Certificate of Title for the 2022 GMC noted a lien of WLPOC, LLC dated 12/21/2021.[19] The Certificate of Title for the 2020 Jeep noted a lien of WLPOC, LLC dated 11/5/2021.[20] The Loan Agreements included the typed name of each debtor, and ML Gallegos, on behalf of Lender WLPOC, LLC, with the notation "Electronic Signature Approved".[21] The Lender's address was listed as 7238 S. Gore Range Road, Littleton, Colorado 80177.[22]

Following his review of the information provided by the Huycks and after conducting his own additional research on the entities involved in the vehicle transactions, the Trustee conducted a continued § 341 meeting on April 26, 2022. The Huycks explained that "WLPOC" could have been a reference to Wanderlust Photography of Colorado, but they could not confirm that to be true. They further explained that The Huyck Corporation was a multinational business that had operated for over 100 years, which included a benevolent division named the Huyck Corporation Benevolent Fund that was established to provide financial assistance to Huyck family members in need. WLPOC was a subsidiary of the Huyck Corporation. They also confirmed that ML Gallegos was Mr. Huyck's sister, Mary Lynn Gallegos. They testified that the only contact they had with the Huyck Corporation or the Huyck Corporation Benevolent Fund was through Ms. Gallegos. Ms. Gallegos signed the loan documents on behalf of WLPOC, LLC (A Division of the Huyck Corporation). The Huycks testified that neither of them knew

---

[18] Resp't's Exs. I and J.
[19] Resp't's Ex. G.
[20] Resp't's Ex. H.
[21] Resp't's Exs. I and J.
[22] This is Ms. Gallegos' home address. This is also the address of Wanderlust Photography of Oklahoma and Colorado, LLC, whose registered agent is Jim Huyck, according to a 2021 Report filed with the Colorado Secretary of State. See Resp't's Ex. T.

why WLPOC was chosen as the lender and that the limited negotiations they had regarding the terms of the loan agreements were conducted through Ms. Gallegos.

After Ms. Walsh questioned the Huycks, the Trustee announced on the record that he was viewing the website of WLPOC.com, the purported lender on the Vehicles. The website included a picture of Mr. Huyck next to a turtle and appeared to be the website for Mr. Huyck's photography business. Therefore, the Trustee had significant questions about the existence of the Huyck Corporation and whether the Huycks' vehicle loan transactions with WLPOC were "real."[23] In fact, he stated that the transactions looked to be fraudulent. The Trustee explained that the Vehicles were very valuable and that he had a responsibility as Trustee to secure them to protect the estate's interest. The Trustee directed the Huycks not to drive the Vehicles until he gave them permission to do so.[24] The Trustee confirmed the appropriateness of his directive to the Huycks not to drive the Vehicles by asking Ms. Walsh if he had overstepped his bounds. Ms. Walsh responded, "No, I'm fine with that."[25] The Trustee also asked that the Huycks, through counsel, provide him with the phone number of Ms. Gallegos and advised that he intended to contact her that afternoon. Mr. Bigby and Ms. Walsh indicated that they were interested in being on the call to Ms. Gallegos.[26]

Given the restrictions the Trustee put on the use of the Vehicles, Mr. Huyck asked how he was to travel to scheduled medical appointments. Ms. Walsh advised Mr. Huyck to talk with his attorney. The Trustee said he did not have an answer to that question. He continued the meeting of creditors to May 3, 2022. On April 27, 2022, the Trustee filed a Report of Asset Case

---

[23] Resp't's Ex. Z-054:8 – 14; Z-056-57.
[24] Resp't's Ex. Z-054:21 - 24.
[25] Resp't's Ex. Z-057:13 - 19.
[26] The evidence is unclear whether either Mr. Bigby or Ms. Walsh was on the Trustee's call to Ms. Gallegos.

and Interim Report, identifying "Vehicles" as assets of the estate.[27] The Clerk of Court then entered a Notice to File Claims with a bar date of August 2, 2022.[28]

At the evidentiary hearing, the Trustee explained that family transactions like these often require additional investigation to determine whether they stand up to legal scrutiny or should be challenged for the benefit of the estate. The Trustee also testified that his own investigation put into doubt the very existence of WLPOC and The Huyck Corporation. Besides the unusual vehicle transactions, the Trustee identified other "red flags," which caused him to scrutinize the Huycks' case. These included an income discrepancy, the possible operation of an undisclosed business, and potentially undisclosed items of personal property that had not been addressed to his satisfaction.

At the continued § 341 meeting on May 3, 2022, the Trustee made it clear that there were still many unanswered questions about the Huycks' financial transactions. He asked the Huycks about the purchase of the Vehicles, bank transfers, loan transactions with WLPOC and the Huyck Corporation, and obtaining the Certificates of Title with WLPOC, LLC lien notations. Mr. Huyck explained that the 2020 Jeep had been purchased in December of 2019 in Golden, Colorado. The Loan Agreement, however, which stated "[t]he proceeds of this loan are to be used to purchase a 2020 Jeep Wrangler," was dated and signed nearly two years later on October 20, 2021. Mr. Huyck could not explain that but agreed that the loan proceeds were not actually used to purchase the vehicle in 2019. The 2022 GMC was purchased from a car dealership in Fort Smith, Arkansas on November 24, 2021. Mr. Huyck applied for and obtained Certificates of Title for both Vehicles, identifying WLPOC as the lien holder, sometime in the fall of 2021 by

---

[27] Trustee's Report of Asset Case and Interim Report, ECF No. 15.
[28] Notice to File Claims, ECF No. 17. To date, the Claims Register reflects total filed claims of $136,189.05.

filling out the proper paperwork at the Keys, Oklahoma Tag Agency. He presented the Loan Agreements as evidence of the liens.[29] Mr. Huyck also explained that he received a phone call from an unknown person on behalf of the Huyck Corporation with instructions for sending loan payments for the Vehicles. These instructions were to mail money orders to Finix, Inc., a payment processing center in San Francisco, California.

Although he still had questions, the Trustee concluded the meeting of creditors, with the approval of Ms. Walsh. The Trustee then clearly explained his legal analysis and his intent to challenge the validity of the loan transactions and seek avoidance of the liens on both Vehicles. His position was that the loan on the 2020 Jeep was unsecured until November 2021 when the lien was placed. This was just outside the 90-day preference period but appeared to be made to an insider, therefore he believed he could avoid the lien. He believed the lien on the 2022 GMC was not timely perfected and could also be avoided. The Trustee further advised that he would proceed through the legal process to avoid both liens. Mr. Bigby advised that his clients had insurance coverage on the Vehicles and requested that they be permitted to drive the Vehicles until such time as the Trustee succeeded in having the liens released and obtained possession of the Vehicles. The Trustee responded by saying, "I can't stop anybody from driving a vehicle as I sit here in my office in Tulsa, Oklahoma . . . I'm not saying I'm conceding or agreeing with it

---

[29] The Huycks received an Arkansas Certificate of Origin for the 2022 GMC but were told no lien could be placed on that vehicle's title, so Mr. Huyck applied for an Oklahoma Certificate of Title, noting the lien of WLPOC. *See* Resp't's Ex. M. Mr. Huyck visited the Oklahoma Tag Office in Keys, Oklahoma with the certificate and the Loan Agreement for the 2022 GMC and requested a new title with WLPOC's lien noted thereon. Although the Oklahoma Certificate of Title they received indicated that it was issued December 22, 2021, and the WLPOC lien thereon is dated December 21, 2021, Mr. Huyck stated that he requested a new title quite a while prior to those dates.

either."[30] Finally, both the Trustee and Ms. Walsh requested that the Huycks consent to the production of additional bank records.

The Huycks characterized the Trustee's request that they not drive the Vehicles as placing them under house arrest, which confined them to their home and prevented them from attending medical appointments, obtaining prescription medication and food. However, as their own evidence demonstrated, the Huycks had other means of transportation. Their neighbor, Wayne Galloway, testified that he gave them permission to use his vehicle any time they needed to, from April 27, 2022 forward.[31] He also testified that he obtained groceries for the Huycks and drove Mr. Huyck to medical appointments. Despite the allegations in their pleadings that they were confined to their home and that Mr. Huyck missed many appointments between the second and third meetings of creditors, they offered no evidence to this Court of missed doctors' appointments or that they were unable to obtain necessary items due to lack of use of these Vehicles. Instead, the evidence of many red flags in the Bankruptcy Documents, loan documents, the Huycks testimony at the § 341 meeting and information regarding the establishment and existence of the Huyck Corporation provided ample cause for the Trustee's request that they not drive these Vehicles. The Court finds that this request was reasonable and advisable under the circumstances. At no time during the meetings of creditors did the Trustee state or express in any way that he did not care what happened to the Huycks because of his request that they not drive the Vehicles. The Court finds no factual support for the allegation that the Trustee placed the Huycks under "house arrest" by depriving them of access to transportation nor did they experience a de facto house arrest.

---

[30] Resp't's Ex. AA-089:8 - 16.
[31] Resp't's Ex. S-025. April 27, 2022 was just one day after the second meeting of creditors, during which the Trustee first advised the Huycks not to drive the Vehicles.

The Trustee was not the only party who questioned the accuracy and completeness of the Huycks' Bankruptcy Documents and their testimony at the meeting of creditors. After her own investigation, the United States Trustee filed an adversary proceeding[32] seeking a denial of the Huycks' discharges alleging, among other things, that the Huycks made misrepresentations during their bankruptcy, and their Bankruptcy Documents contained numerous omissions and errors regarding assets, an inheritance received by Mrs. Huyck, the WLPOC transaction, and funds received from a home refinancing. The Huycks denied most of these allegations and stated that they had provided complete and accurate information to their attorney. Ultimately, the Huycks filed a waiver of discharge,[33] which was approved by the Court by Order entered on May 26, 2023.[34] Following the Court's approval of the waiver, the United States Trustee's adversary proceeding was dismissed.

During the evidentiary hearing, the Huycks testified that their statements at the § 341 meetings that they had reviewed the Bankruptcy Documents before filing and found them to be accurate were in error because they had been misled about the actual documents that were filed. They testified that their former counsel failed to provide them with a copy of their "complete filing," suggesting that they did not know the contents of their own Bankruptcy Documents when they signed them under penalty of perjury. According to Mrs. Huyck, they did not learn of or view the full 69 pages of Bankruptcy Documents filed February 28, 2022 until June 27, 2022, well after the conclusion of the § 341 meeting and after they had turned over possession of the Vehicles to the Trustee. Until then, they testified that they believed their filed Bankruptcy Documents consisted of just 17 pages. Nevertheless, the Huycks admitted that the filed

---

[32] Adversary Case No. 22-08003 was filed on June 2, 2022.
[33] Adv. Case No. 22-8003, ECF No. 33.
[34] Adv. Case No. 22-8003, ECF No. 34.

Bankruptcy Documents were inaccurate. Mrs. Huyck testified that the blame for the inaccuracies belonged to their former attorney, Mr. Bigby. The Huycks testified that they provided complete and accurate information about their finances to Mr. Bigby, but for reasons unknown to them, he failed to include it all in their Bankruptcy Documents. The Huycks blame Mr. Bigby for causing the Trustee's initial distrust of them and the information they provided. Mrs. Huyck testified that it was reasonable for the Trustee to rely on their Bankruptcy Documents, presume them to be correct, and to rely on their § 341 meeting testimony given under oath that their Bankruptcy Documents were complete and accurate, needing no changes or corrections. She further testified that she knew his duty as the trustee was to make sure creditors were represented fairly, identify any assets that could be sold to pay their creditors, and that he required accurate information to perform his duties. Mr. Bigby did not testify at trial and was therefore unable to defend his actions or provide an explanation for the alleged discrepancies between the information the Huycks testified was provided to him and the filed Bankruptcy Documents. The Huycks have since been unable to convince the Trustee that they are trustworthy and blame that on the Trustee's bias against them.

The questions of why no address was provided for WLPOC on Schedule D and why WLPOC was not on the creditor matrix have never been answered. To date, neither Schedule D nor the Creditor Matrix have been amended to include the address for WLPOC. WPLOC has not filed a claim in this case. The Huycks blamed their attorney for failing to include that information on the Bankruptcy Documents, yet Mrs. Huyck testified that she reviewed the entire Creditor Matrix prior to the filing of their bankruptcy case and did not notice that WLPOC – their second largest creditor – was not listed. She had no explanation for that omission nor for her failure to alert her attorney to the mistake. They did not ask Mr. Bigby to correct their

schedules, statements or matrix to address mistakes they identified. Nor did they ever inform the Trustee that their answers under oath at the § 341 meetings were incorrect because they had never viewed a complete copy of the Bankruptcy Documents before filing. The Court finds their testimony regarding inaccuracy in their Bankruptcy Documents was vague and self-serving. Therefore, the Court is skeptical about the credibility of their testimony that, until June 27, 2022, they had no idea that the Bankruptcy Documents they reviewed and signed prior to filing were incomplete and incorrect.

### C. The Trustee's Recovery of the Vehicles

Consistent with the Trustee's stated intent during the § 341 meetings to seek recovery of the Vehicles for the estate through legal process, he filed a Motion to Turn Over Assets on May 5, 2022.[35] He also filed an adversary proceeding against WLPOC, LLC, WLPOC, a division of the Huyck Corporation, Wanderlust Photography of Oklahoma and Colorado, Wangner Ltd Products, Oneida and Corning, LLC., and The Huyck Corporation Benevolent Fund.[36] The Trustee served these entities by personal service on Mary Lynn Gallegos at her residence in Colorado.[37]

The Motion for Turn Over Assets was resolved by an Agreed Order to Turn Over Assets, entered on May 27, 2022.[38] The Agreed Order represented a settlement between the Trustee and the Huycks, negotiated by their attorney, Mr. Bigby, whereby the Huycks agreed to turn over the

---

[35] ECF No. 20.
[36] Adversary Case No. 22-08002 was filed on May 17, 2022.
[37] Proper service of the Summons and Complaint was made upon the Defendants (WLPOC, LLC, WLPOC, a division of the Huyck Corporation, Wanderlust Photography of Oklahoma and Colorado, Wagner Ltd Products, Oneida and Corning, LLC., and The Huyck Corporation Benevolent Fund) via personal delivery upon Mary Lynn Gallegos at 7238 S. Gore Range Road, Littleton, Colorado, by Derek Minto of Front Range Legal Process Service, a person authorized under the laws of the State of Colorado to serve process.
[38] ECF No. 33.

Vehicles to the Trustee no later than May 27, 2022, and agreed not to object to a motion to sell the Vehicles or to the relief sought by the Trustee in the adversary case filed against WLPOC and related Huyck entities. In exchange, the Trustee agreed not to object to the Huycks amending Schedule C to include an exemption of $7,500 in the Vehicles, which they would be paid from the proceeds of the sale of the Vehicles. Mr. and Mrs. Huyck and their attorney each signed the Agreed Order indicating their agreement to the terms. The Huycks confirmed their consent to the Agreed Order by filing an amendment to Schedule C, in which they each claimed a $3,750 exemption in the 2022 GMC Sierra Pickup.[39] With no appearances or opposition to the relief requested, the Adversary Proceeding against WLPOC and related entities was resolved by the entry of an Order for Default Judgment against the Defendants, avoiding the transfers of the purported liens on the Vehicles pursuant to §§ 547, 548, and 550, voiding the liens, and allowing the Trustee to administer the Vehicles free and clear of any such liens.[40]

The Trustee utilized the appropriate legal process and procedure to seek employment of J. Edward Vierheller of Mr. Ed's Auction, Inc., to serve as the estate's auctioneer. The Court entered the Order Approving the Employment on May 5, 2022.[41] On June 16, 2022, the Trustee filed a Motion for Authority to Sell Personal Property of the Estate Free and Clear of Liens Under 11 U.S.C. Section 363(f) and Notice of Proposed Sale.[42] The record reflects there were no objections to the Trustee's motion. The sale was scheduled to be conducted by public auction, including online bidding, at the location of Mr. Ed's Auction Company, Inc., on July 20, 2022. The sale was conducted on that date, the Vehicles were sold, and the Trustee filed a Report of

---

[39] ECF No. 36.
[40] Adversary Case No. 22-08002, ECF No. 11, entered July 12, 2022.
[41] ECF No. 24.
[42] ECF No. 39.

Sale showing the Vehicles sold for a total of $99,000.[43] Mr. Ed's Auction Co., Inc., was awarded compensation for auctioneer services associated with the sale of the Vehicles in the amount of $11,025.[44]

The Huycks claimed that they were coerced into settling with the Trustee with respect to turning over the Vehicles and allowing their sale, including the agreement not to object to the Motion to Sell and to the relief requested in the adversary proceeding against WLPOC and related entities.[45] They produced no evidence of this claim at the evidentiary hearing. Instead, Mr. Huyck testified that much of his evidence consisted of a narrative of his view of events in their bankruptcy case and his feelings about those events, and that he had no "hard and fast proof of that."[46]

### D. The Trustee's Visit to the Huycks' Residence in Cookson

On May 27, 2022, a date agreed upon by the Huycks, the Trustee and two employees of Mr. Ed's Auction Company, Zach Vierheller and John Weston, drove to the Huycks' residence in a remote area of rural Cookson, Oklahoma.[47] When they arrived, the Vehicles were parked, not in the Huycks' driveway, but on the road in front of property that they later learned was owned by the Huycks' neighbor, Mike Prince.[48] Mr. Huyck testified that he assumed the Trustee would bring a tow truck to pick up the Vehicles as one was reportedly damaged from a previous accident. Parking them on the road in front of their neighbor's property would allow for easier

---

[43] ECF No. 44.
[44] ECF No. 48.
[45] ECF No. 81.
[46] Tr. Aug. 30, 2023, p. 110.
[47] Mr. Vierheller is the grandson of the owner of Mr. Ed's Auction Company and has worked for that company for many years. He estimated that he has participated in hundreds of trips to pick up property to be auctioned in bankruptcy cases. He has also worked as a deputy sheriff and has been in law enforcement for 29 years. Mr. Weston is Mr. Vierheller's cousin.
[48] Mr. Prince is retired but has worked in local law enforcement for twenty years.

access for a tow truck. Assuming that the Vehicles would be parked on the Huycks' property, the Trustee mistakenly entered Mr. Prince's property believing it was the Huycks' residence. He observed several vehicles and other items of personal property that had not been disclosed in the Huycks' Bankruptcy Documents.  Mr. Huyck and Mr. Prince met the Trustee as they entered Mr. Prince's property. The Trustee, along with Mr. Vierheller and Mr. Weston, walked part of Mr. Prince's property. Using the camera on his cell phone, the Trustee took several photos of items he thought might well be property of the Huycks' bankruptcy estate. When informed that the property they were on did not belong to the Huycks, the Trustee, Mr. Vierheller and Mr. Weston immediately left and walked next door to the Huyck property.

Mr. Prince testified that he was unhappy with the Trustee being on his property, walking around, taking pictures, and thought the Trustee was trespassing.  Mr. Prince admitted on cross examination that because the Vehicles were parked in front of his property, it was possible that someone could have mistakenly believed that his property belonged to the Huycks.  Mr. Prince testified that the Trustee's presence on his property caused him no harm, but he expressed an unfounded concern that the items the Trustee took pictures of had somehow become part of the Huycks' bankruptcy. The Trustee testified that once he realized he was not on the Huycks' property, he ended his inspection of Mr. Prince's property and took no other action regarding Prince's property. To date, the Trustee has neither claimed nor sought to administer any of the items of personal property he took pictures of that were located on Mr. Prince's property.

The Huycks expected the Vehicles to be picked up by a tow truck. They were not expecting to see the Trustee show up at their home.[49] Mr. Vierheller testified that Mr. Huyck

---

[49] The Huycks have alleged that the Trustee was required but failed to provide advanced notice of his visit. The Trustee testified that in this case, particularly with suspicion of undisclosed assets, advanced notice of his visit would have provided an opportunity to hide potential assets.

refused the Trustee's request to inspect his property, and asked the Trustee if he had a warrant to search his property. Mr. Vierheller testified that the Trustee politely answered Mr. Huyck, stating that he was the Trustee and needed to inspect the property. According to Mr. Huyck, the Trustee responded by saying he was the trustee and as such he "owned" the property and therefore did not need a warrant to inspect property of the estate.[50] This exchange offended Mr. Huyck who, according to the Trustee's and Mr. Vierheller's testimony, clearly wanted them to leave. Mr. Huyck testified that he heard an exchange between the Trustee and Mr. Vierheller insinuating that they could have "heyday" selling the items of personal property found on the Huyck property. Mr. Huyck believed that Mr. Vierheller and the Trustee were plotting to sell these items improperly for personal profit.[51] Mr. Huyck was also offended by this exchange.

Mr. Huyck accompanied the Trustee as he inspected the property and gave him access to one of two sheds located on the Huycks' property. Mr. Huyck refused to allow the Trustee to inspect another shed, claiming that he rented the shed to a third party and was not given the key code to the lock on the door. The Trustee did not seek access to the Huycks' home located on the property. While on the Huycks' property, in addition to the sheds, the Trustee and Mr. Vierheller observed several vehicles, trailers, car parts and other items of personal property – some of

---

[50] While it is unclear exactly what was said, the Trustee could have chosen a less-confrontational way to describe a trustee's interest in property of the estate. The Court understands that circumstances were tense and pointed words are often the first to be expressed. However, the Court understands that the Trustee was not asserting personal ownership but was using an often-used shorthand to indicate the extent of his authority and fiduciary duties as trustee under the Bankruptcy Code.

[51] The evidence is unclear as to the exact words that were used during this exchange. The Trustee testified, however, that he and Mr. Vierheller had no intent to sell or administer any property found on the Huycks' without going through the legal process required by the Bankruptcy Code and Rules. The Court accepts this testimony as representative of the Trustee's intent to abide by the appropriate rules and procedures. As a practical matter, the Bankruptcy Code incentivizes trustees and their agents to find and sell estate assets by paying them a percentage of what they recover. So, in that sense, they may profit, but only through their professional employment, by following proper procedures and obtaining court approval.

which had not been disclosed in the Huycks' Bankruptcy Documents or through testimony at the meeting of creditors. The Trustee took photos of these items with the intent of investigating and determining whether they were property of the estate.[52]

One of the vehicles located on Huycks' property was a Ford Expedition. The Huycks alleged that the Trustee broke into the vehicle, rummaged around inside, and took some photos. Mr. Vierheller testified that he saw the Trustee take photos of the vehicle's VIN through the windshield and of the license tag but denied that the Trustee broke into it. The Ford Expedition is owned by Wayne Galloway. The Expedition was on the Huycks' property because Mr. Galloway gave the Huycks permission to use the vehicle for as long as necessary to run errands, buy groceries, and to travel to medical appointments. This permission was evidenced by a note signed by Mr. Galloway and dated April 27, 2022.[53]

Despite the Huycks' allegations in their pleadings, no evidence was presented that the Trustee entered their home, that he screamed or yelled at them, threatened them, or was on a tirade while inspecting their property. The Court finds that the evidence reflects that the Trustee acted in a professional manner in conducting the inspection of the Huycks' property.

### E. Delay in Administration of Case

Once the Vehicles had been sold at auction and the proceeds deposited in the estate's bank account, the Trustee was to send a check to the Huycks for their exempt portion of the proceeds. However, when he did not do so immediately, Mr. Bigby emailed him to inquire about the payment. The Huycks were upset that the Trustee did not send them their exempt portion of the sales proceeds for over two weeks. They were also upset that the Trustee had not yet

---

[52] Resp't's Ex. S.
[53] Respondents Exhibit S-025. The note's date of April 27, 2022, is just one day after Mr. Greenough instructed the Huycks not to drive the Vehicles.

concluded their bankruptcy case so that they may get on with their lives. The Trustee acknowledged that press of business caused a short delay in getting the check sent to the Huycks' counsel, but he did remit their share pursuant to their agreement. The Court finds that this was not an unreasonable amount of time. The Court also finds that the delay in closing this case is not unreasonable given the withdrawal of counsel for the Huycks, the process of their waiver of discharge, and the Huycks' Motion to Remove the Trustee.

To the extent the "Conclusions of Law" contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

## Conclusions of Law

### A.  Standards for Removal of Trustee

Removal of a bankruptcy trustee is governed by 11 U.S.C. § 324(a): "The court, after notice and a hearing, may remove a trustee, other than the United States trustee, or an examiner, for cause."[54] The party seeking removal for cause has the burden of proof and must show specific facts supporting removal.[55,56] Since removal of a trustee for cause in one case shall result in removal from all other cases in which the trustee serves unless the court orders otherwise,[57] removal of a trustee is considered an "extreme remedy, even when a trustee has acted

---

[54] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

[55] *In re Brooke Corp.,* 2016 WL 519731, at *6 (Bankr. D. Kan. Feb. 5, 2016) (citing *In re Miller,* 302 B.R. 705 (B.A.P. 10th Cir. 2003)); *In re AFI Holding, Inc.,* 530 F.3d 832, 845 (9th Cir. 2008).

[56] Some courts have held that debtors lack standing to seek removal of a trustee based on his administration of the estate in general. *See In re Baroni,* 643 B.R. 253, 287 (Bankr. C.D. Calif. 2022). *See also In re Levitt,* 632 B.R. 527 (B.A.P. 8th Cir. 2021) (Chapter 7 debtors lack standing to appeal an order denying their motion to remove the trustee where estate was insolvent since there was no possibility a successful appeal would entitle them to a distribution of a surplus and there would be no impact on their discharge as they were ineligible for a discharge.)

[57] § 324(b).

negligently."[58] Therefore, the movant must make a "strong showing" by at least a preponderance of the evidence.[59]

"Cause" is not defined by the Bankruptcy Code. Courts are to make that determination on a case-by-case basis.[60] Generally, a party seeking the removal of a trustee must prove that there has been actual fraud and actual injury to interests of the estate.[61] Circumstances that may constitute cause for removal include trustee incompetence, violation of a trustee's fiduciary duty, misconduct or failure to perform the duties of a trustee, lack of disinterestedness or holding an interest adverse to the estate, and unreasonable delay in the performance of trustee duties.[62] "[A] trustee will not be removed for mistakes in judgment where the judgment is discretionary and reasonable under the circumstances."[63] Further, courts should consider the best interests of the estate when determining whether to remove a trustee.[64]

The Huycks move to remove the Trustee for various reasons, alleging violations of the U.S. Constitution, the Oklahoma Constitution, Lawyers Creed, the U.S. Trustee Chapter 7 Handbook, the Oklahoma Bar Association Standards, commission of crimes including willful trespass, breaking and entering, illegal search, and coercion, and violation of the McNulta Rule.[65] They have made very serious accusations against the Trustee, including searching their

---

[58] *In re United Tax Group, LLC,* 622 B.R. 148, 157 (Bankr. D. Del. 2020).

[59] *Id.* (citation omitted).

[60] *Miller,* 302 B.R. at 709.

[61] *In re Varela,* 530 B.R. 573, 586 (Bankr. E.D.N.Y. 2012) (citing *In re Lundborg,* 110 B.R. 106, 108 (Bankr. D. Conn. 1990)).

[62] *See United Tax Group, LLC,* 622 B.R. at 157-58; *Brooke Corp.,* 2016 WL 519731, at *6; *Lundborg,* 110 B.R. at 108 (citing cases); 3 Collier on Bankruptcy ¶ 324.02 (16th Ed. 2024).

[63] *In re Haugen Constr. Serv., Inc.,* 104 B.R. 233, 240 (Bankr. D.N.D.1989).

[64] *Brooke Corp.,* 2016 WL 519731, at *6.

[65] Movants' Closing Arguments, ECF No. 114. The Huycks do not provide a citation for this Rule. Presumably, the reference is to *McNulta v. Lochridge,* 141 U.S. 327, 332 (1891) which held that actions against a receiver are not personal as judgments as they "are payable only from the funds in his hands."

property for items that would bring him "personal financial gain," threatening and intimidating them, being violent and verbally abusive, placing them under house arrest, conducting a "witch hunt" against them, abusing the court system, altering documents, and having a "vendetta" against them.[66] These allegations and the evidence presented reflect misconceptions about a trustee's duties and role in administering the bankruptcy estate. Nevertheless, the Court must address these accusations, and clearly set forth why this Motion for Removal has no merit and must be denied.

### B. Duties of the Parties

#### a. Chapter 7 Trustee

A chapter 7 bankruptcy trustee plays a vital role in the case. He is the "representative of the estate,"[67] possessing (1) fiduciary obligations to the bankruptcy court and the parties in cases in which the trustee serves, and (2) "institutional" or statutory obligations, owed to the bankruptcy process itself.[68] "The principal duty of the trustee is to collect and liquidate the property of the estate and to distribute the proceeds to creditors. A chapter 7 case must be administered to maximize and expedite dividends to creditors."[69] Further, institutional obligations include but are not limited to: being accountable for property they receive, investigating the financial affairs of the debtor, examination of claims filed and objecting to a claim that is improper, furnishing information concerning the estates and their administration to parties in interest, review of documents provided by the debtor for evidence of abuse to determine whether to oppose a debtor's discharge and seek dismissal pursuant to § 707(b), and

---

[66] ECF No. 114.
[67] § 323(a).
[68] *See* Hon. Steven W. Rhodes, *The Fiduciary and Institutional Obligations of a Chapter 7 Bankruptcy Trustee*, 80 AM. BANKR. L.J. 147, 147–48 (2006).
[69] Handbook of Chapter 7 Trustees, ch. 4 (hereinafter "Trustee Handbook"). *See also* § 704(a)(1).

preparation and filing of reports with the court and the United States trustee.[70] Trustees also conduct meetings of creditors, taking testimony and examining the debtor regarding consequences of filing bankruptcy.[71]

The Trustee Handbook was prepared by the United States Trustee Program as an instructional guide regarding the statutory and fiduciary duties owed by a chapter 7 trustee to the debtor, creditors, other parties in interest, and the United States trustee. "Prior to administering a case as an asset case, the trustee must determine whether a bankruptcy estate contains assets which would generate sufficient funds to make a meaningful distribution to unsecured creditors."[72] He does this by reviewing the bankruptcy schedules filed by the debtor and must also conduct an independent investigation into whether to proceed as an asset case.[73] When the trustee thinks assets of value exist, he has a duty to control and preserve those assets:

> In those cases where the property appears to have value for the estate, *the trustee must obtain control over the property, which may include changing the locks at the premises, hiring guards, etc. The trustee also must immediately take all other steps which may be reasonably necessary to preserve the assets.* It is not always sufficient to wait until after the meeting of creditors to take action to preserve assets. 11 U.S.C. § 704.[74]
> . . . .
>
> *When the debtor has control or possession of assets that have equity, the trustee must seek to gain control of those assets as soon as possible.* 11 U.S.C. § 704. Normally, the assets will be delivered to the trustee voluntarily and without court order.[75]

### b. Duties of Debtors

---

[70] § 704(a)(2)–(a)(9). *See also* Trustee Handbook, ch. 3.
[71] § 341(a)-(d). *See also* Trustee Handbook, ch. 3.E.
[72] Trustee Handbook, ch. 4.G.1.
[73] *Id*. *See also* § 704.
[74] Trustee Handbook, ch. 4.C.3.f. (emphasis added).
[75] *Id.* at ch. 4.C.6 (emphasis added).

A trustee is not the only party who owes duties to the estate. Debtors have duties as well. A debtor has a duty to file certain documents as outlined in §§ 521 and 109, and Fed. R. Bankr. P. 1007. A debtor must also provide accurate financial information and cooperate with the trustee, pursuant to § 707 and Fed. R. Bankr. P. 4002. A debtor must verify all petitions, schedules, lists, statements and amendments thereto under penalty of perjury.[76] A debtor must also cooperate with the trustee and surrender property of the estate to him.[77] A trustee must ensure that debtors comply with those statutory duties.[78]

### C. The Huycks' Bankruptcy Documents and Financial Transactions

The Huycks confirmed that the documents they filed with this Court were at best incomplete. Their most glaring omission was the address for WLPOC. That their second largest creditor received no notice that they had filed bankruptcy – an omission that they have never explained or corrected – was justifiably an immediate concern for the Trustee as well as the U.S. Trustee. The omission cannot be blamed solely on their attorney, as Mrs. Huyck testified that she reviewed the entire Creditor Matrix before it was filed and did not alert her attorney that WLPOC was not included. When questioned about WLPOC by the Trustee and Ms. Walsh during § 341 meetings, their explanations prompted more questions.

The Court does not believe that the Huycks simply overlooked the omission of WLPOC's address. Both Mr. and Mrs. Huyck were previous filers and well aware of the requirements of full disclosure by debtors in a bankruptcy case. Instead, this omission is consistent with an intent to mislead the Trustee, U.S. Trustee, and their creditors into thinking that the Vehicles were fully secured and, thus, assets which were not available to satisfy other creditors. That their attorney

---

[76] 28 U.S.C. § 1746; Fed. R. Bankr. P. 1008.
[77] § 521(4).
[78] 11 U.S.C. § 704(a); Trustee Handbook, ch. 3.

may have omitted some assets or did not accurately reflect information on their Bankruptcy Documents is not the fault of the Trustee and does not justify his removal. As Mrs. Huyck acknowledged, the Trustee and their creditors reasonably relied on the Bankruptcy Documents and other financial documents they supplied and reasonably believed them to be true and accurate, as verified by the Huycks' signatures on the Bankruptcy Documents themselves. In seeking additional information from the Huycks, investigating the alleged loan transactions with WLPOC and the Huyck Corporation, and seeking additional bank account records the Trustee was complying with his duties set forth in the Trustee Handbook, and ensuring that the Huycks complied with their statutory duties as debtors. The Court finds that the Trustee appropriately identified the legal deficiencies in the loan transactions between the Debtors and WLPOC regarding the Vehicles, pursued additional information and conducted his own investigation into those transactions. These actions were consistent with his duties as a trustee and are not grounds for removal.

### D. The Trustee's Conduct During 341 Meetings and Restriction on Use of the Vehicles

The Court has made a complete and thorough review of the transcripts of the initial meeting of creditors and the two continued meetings. The Trustee was polite and respectful to everyone in attendance, including the Huycks. He was candid with them and their attorney about the problems he observed regarding the "family transaction" with WLPOC and the Huyck Corporation involving two valuable vehicles. His candor and direct communication regarding his intentions regarding these transactions provided the Huycks and their counsel ample opportunity to prove that the Huyck Corporation was real, and that the Vehicle transactions were arms-length and legally sufficient. That never happened – not because the Trustee was biased and unreasonable as the Huycks contend, but because even after being sued, neither WLPOC nor any

of the related Huyck entities defended the vehicle transactions or even entered an appearance in this bankruptcy case or the adversary proceeding.

The Court finds that the Trustee approached his duty to investigate potential estate assets professionally and with an appropriate level of skepticism. Indeed, his analysis of the transactions and disclosure of his legal position to the Huycks and their attorney was entirely in keeping with his duties as the trustee to thoroughly investigate, locate and identify potential assets of the estate for liquidation and distribution to creditors.

In addition, his directive to the Huycks not to drive the Vehicles was appropriate under the circumstances that existed at the time the directive was issued. At that point in time, the Vehicles had significant value, the Huycks had not claimed the Vehicles as exempt, and they had failed to provide an address for the WLPOC as secured creditor. Neither WLPOC nor The Huyck Corporation Benevolent Fund was listed on the official mailing matrix, and the loan transactions associated with the Vehicles were suspected of being fabricated. He consulted Ms. Walsh, the Assistant U.S. Trustee, on the record regarding his directive not to drive the Vehicles and she confirmed that this action was appropriate. As this Court has noted, where a debtor has control or possession of assets with equity, the trustee is required to seek control as soon as possible and "must immediately take all other steps which may be reasonably necessary to preserve the assets."[79] In this case, the Trustee's actions were in full compliance with his statutory duties.

### E. The Trustee's Actions to Obtain Possession of the Vehicles and Inspect Debtors' Property

The Trustee appropriately identified the legal deficiencies in the loan transactions between the Huycks and WLPOC regarding the Vehicles. He followed proper legal process and procedure to take possession of the Vehicles and sell them at auction for the benefit of creditors

---

[79] Trustee Handbook, ch. 4.C.3.f.

of the Huyck bankruptcy estate. These actions were consistent with his duties and obligations as the trustee of the bankruptcy estate; therefore, they are not grounds for removal.

During the negotiations regarding turnover of the Vehicles, the Huycks were represented by counsel. In fact, Mr. Bigby negotiated beneficial terms that they agreed to by securing a $7,500 exemption in the 2022 GMC to be paid to them by the Trustee from the sale proceeds. The Court finds that this settlement was appropriate and was within the discretion of the Trustee's business judgment. The Court observes that the settlement was arguably more generous to the Huycks than it could have been because the Trustee had legal support for the position that they were not entitled to claim any exemptions relating to assets recovered through the Trustee's avoidance action.[80] In that sense, it was the Trustee who made concessions to them, rather than them being coerced into entering an unjust agreement out of economic distress. There was no evidence that the Huycks were threatened or coerced into entering into the agreement.

The Trustee's conduct during his visit to the Huycks' property was entirely appropriate. Verbal exchanges like the ones between the Trustee and Mr. Huyck during the Trustee's on-site inspection are usually not pleasant – particularly when a trustee's presence on property of the estate is being challenged – and while they may have added to the existing tension on the Huyck property that day, they are not improper and simply do not constitute cause under § 324 for removal of the Trustee.[81] As the Court has noted, the Bankruptcy Code requires that debtors turn over property of the estate to the trustee, and requires trustees to collect property of the estate and reduce it to money to pay creditors and expenses of the estate. The Trustee was at the Huycks' property pursuant to an Agreed Order to Turn Over Assets signed by both Debtors, their former

---

[80] See § 522(g).
[81] Even where a trustee takes aggressive positions, is gruff or overbearing, such actions do not constitute an abuse of office nor establish cause for his removal. *In re United Tax Group, LLC,* 622 B.R. 148, 170 – 71 (Bankr. D. Del. 2020).

attorney, and the Trustee, and approved by this Court. He appeared on the Huycks' real property at a prearranged time agreed upon by them and their attorney. On his arrival, he viewed the Vehicles parked near the roadway and reasonably assumed this was the Huycks' property. He could see that there were other items located on the property which he reasonably believed to belong to the Huycks. This aroused his suspicions that the Huycks possessed other property that had not been disclosed and that they did not want the Trustee to view. His duty as the Trustee was to verify whether those items were listed on the Huycks' bankruptcy schedules and whether the items had value. By this point in the case, the Trustee had conducted extensive investigations regarding information they included in their petition and schedules, had notice of the U.S. Trustee's investigation that revealed assets that were not disclosed on their schedules, and had conducted three § 341 meetings. He was quite familiar with what the Huycks disclosed to their creditors in their bankruptcy case. It was his duty to investigate further by walking through the Huycks' property to determine if there were additional, undisclosed assets that should be collected, liquidated, and distributed for creditors.

The Huycks had advance notice of the time the Vehicles would be picked up. That they were surprised that the Trustee would accompany the auction house employees in collecting the Vehicles was due to their own misconceptions about the process, not any fraud or deception by the Trustee. Failure to investigate further or attempt to inspect the property would have been a breach of his duties to the estate. The Trustee did not pressure the Huycks or use intimidation tactics to coerce them into giving permission to inspect their property. When Mr. Huyck denied the Trustee permission to enter the shed, he respected his wishes. He did not bully or threaten the Huycks or Mr. Prince. His statements that the items he viewed on their property belonged to him as Trustee of their bankruptcy estate may have been inartfully expressed but were essentially

correct. The Court concludes that the Trustee accompanying his auctioneer and agent to the Huycks' property without advanced notice of an inspection, walking the property, investigating potential assets, and taking pictures were consistent with his duties and obligations as the trustee of the Huycks' bankruptcy estate and do not constitute grounds for removal.

### F. Allegations of Constitutional Violations

The Huycks allege that the Trustee violated their constitutional rights under the Fourth, Fifth, Eighth and Fourteenth Amendments to the U.S. Constitution.[82] Primarily, they allege that their Fourth Amendment right against unreasonable searches and seizures was violated when the Trustee inspected their property without a search warrant. However, the Fourth Amendment's restrictions regarding governmental searches are rarely implicated in this type of inspection.

> Trustees in bankruptcy are not law enforcement officials. …[A] trustee is required to assemble assets of the estate, liquidate those assets for the benefit of creditors, and distribute proceeds of the estate to creditors. Although trustees may seek the assistance of governmental officials in carrying out their statutory and fiduciary duties and orders of the court, they do not act to assist the government in its investigatory or administrative activities. Rather, the trustees act independently under their statutory mandate in the Bankruptcy Code. Accordingly, a trustee or agent to a trustee is only subject to the Fourth Amendment if (1) the government knew of and acquiesced in the conduct and (2) the trustee acted with the intent to assist the government in its investigatory or administrative purposes.[83]

 Neither of these conditions exist in this case. As the Court has previously discussed, the Trustee's visit to the Huycks' property was reasonable under the circumstances of this case, he did so in performance of his duties as a trustee, the Huycks had proper notice that someone was coming to their property to recover the Vehicles, these Vehicles were determined to be property of the bankruptcy estate by this Court and pursuant to proper bankruptcy procedure, the Huycks

---

[82] U.S. CONST. amends. IV, V, VIII, XIV.
[83] *In re Kerlo*, 311 B.R. 256, 265 (Bankr. C.D. Cal. 2004) (citations omitted).

were afforded due process of law, were represented by counsel throughout the process and had verified their consent to turn over of the Vehicles to the Trustee. There was no violation of their constitutional rights by the Trustee or this Court.

### G. Delay in Administration of the Estate

The Huycks allege that the Trustee has unreasonably delayed the administration of this case. They allege that the Trustee's two-week delay between selling the Vehicle at auction and sending them their exempt portion of the proceeds, as well as the delay in getting the case closed constitutes grounds for his removal. However, as the Court has previously stated, a delay of approximately two weeks between the sale of the Vehicles and the Trustee's mailing of the Huycks' exempt portion of the sale proceed was not unreasonable and does not provide cause for removal. Neither does the alleged delay in case administration support the Trustee's removal. In the Court's experience, where there are legal challenges to secured transactions and ongoing difficulties determining ownership of potential assets, and where debtors are not represented by counsel, cases such as these often take several years to completely administer. The Court notes that a significant cause of the delay alleged by the Huycks has been brought about by the litigation they initiated – including their Motion to Remove the Trustee. There was no evidence produced that supports the removal of the Trustee for unreasonable delay in case administration.

### H. Return of Funds

In addition to removal of the Trustee, the Huycks request that the Court order the Trustee to return all funds and property he holds to them, citing §§ 349(b) and 707. Section 707 concerns dismissal of a case or conversion. No such motion is before the Court. And, as the Huycks acknowledge, even if a motion to dismiss was properly before this Court and dismissal

justified, return of property to a debtor is not required. Section 349(b) gives a court discretion regarding the return of property upon a dismissal of the case.

When a trustee is removed in a chapter 7 case, a successor trustee is appointed to carry on the duties of the trustee. Section 703 outlines the procedure for selection of a successor trustee either by election of qualified creditors or appointment by the United States trustee. Section 325 states that the effect of a vacancy in the office of trustee "does not abate any pending action or proceeding, and the successor trustee shall be substituted as a party in such action or proceeding." Further, Fed. R. Bankr. P. 2012(b) instructs that when a trustee is removed, substitution of the successor trustee in pending matters is automatic, and the successor trustee must prepare an accounting of the prior administration of the estate. Thus, removal of a trustee pursuant to § 324 simply results in the appointment of a new trustee who is charged with collecting and preserving assets of the estate, paying claims, and fulfilling the same duties required of the original trustee. The Court has no basis nor cause to return funds or property held by the Trustee to the Huycks. Therefore, the Huycks' request is denied.

### I. Request to Deny the Trustee's Attorney Fees and Costs

The Huycks ask that estate funds not be used to pay the Trustee's attorney fees for defending this action. In citing the McNulta Rule, they appear to acknowledge that they are not pursuing this action against him individually but as a representative of the bankruptcy estate. Therefore, the Trustee may seek payment of fees and costs associated with those employed to represent or assist him in carrying out his duties.[84] Upon application for attorney fees and costs, the Court will evaluate the application pursuant to § 330 of the Bankruptcy Code.

---

[84] § 327.

## Conclusion and Order of the Court

Cause does not exist to remove the Trustee. The Trustee properly performed his duties as required and in accordance with the Bankruptcy Code and guidelines and instructions in the Trustee Handbook. The Motion to Remove contains many allegations that were unsupported by evidence or proved to be false at trial. In fact, there was no evidence of any conduct by the Trustee that could be considered a breach of duty to the estate justifying dismissal. His behavior toward the Huycks was not improper nor abusive in any manner and certainly provides no support for removal. On the contrary, the evidence showed that the Trustee acted in a professional manner and exhibited courtesy and respect to them in the § 341 meetings, in his correspondence with their counsel, and in court proceedings.

The Court afforded the Huycks as much deference as possible wading through a difficult process without the benefit of counsel; however, the Court finds that they have provided no evidence which would support removal of the Trustee for cause. Essentially, they were disgruntled by the bankruptcy process which requires that they disclose all assets and financial information to receive a discharge of debts. Much of their evidence focused on their dissatisfaction with their attorney for which the Trustee bears no responsibility. They also focused on agreements which they regretted making, unappealed orders, and were generally offended by the Trustee's actions as administrator of their bankruptcy estate. Their impressions are unfortunate, but do not support their request for removal. Moreover, their testimony regarding the Huyck Benevolent Fund, WLPOC, and loans regarding the Vehicles was not credible, and the Trustee was well-justified and acted appropriately in investigating these purported transactions.

The Court is compelled to conclude that this entire exercise was undertaken by the Huycks to get back at the Trustee for not accepting their story, with the ultimate goal of recovering the proceeds of the sale of the Vehicles as they requested in their Motion and their Closing Arguments. The actual evidence and testimony established that they were never under house arrest, that the Trustee did not yell, threaten or harass them, that neither the Trustee nor Mr. Vierheller searched any of their property without the Huycks' permission, and that they had no evidence of self-dealing by the Trustee or the auction house employees. Instead, this was a misguided use of the judicial process by the Huycks to undo their bankruptcy case and thereby collect the proceeds of the sale of the Vehicles for themselves. Therefore, the Motion will be denied, and the Trustee will not be removed from this or any other case. The Court also denies the Huycks' request for return of estate funds.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Request to Remove Mr. Greenough as Trustee filed by William James Huyck III and Julie Anne Huyck (Docket Entry 55) is **denied.**

###